Good morning. Police of the Court, my name is Paul Ray. I'd like to reserve five minutes for rebuttal. I represent Appellants Scott and Kim Tucker and their corporations. The Tuckers asked the court to reverse the summary judgments of the District Court of Nevada entered for the Federal Trade Commission against the Tuckers as to liability under the Truth and Lending Act claim and under a Federal Trade Commission Act claim and for damages for $1.3 billion. The Tuckers request the court to enter summary judgment for the Tuckers on the Truth and Lending Act claim. And the Tuckers also asked the court to dismiss the case for the FTC's failure to comply with its rulemaking requirements. The relevant facts are as follows. And most importantly, each of the some three to five million payday loans at issue in this case has a Truth and Lending Act disclosure which accurately states the finance charge for the borrower's payment obligation and the so-called TILA box. The factual history is that Scott Tucker's loan servicing companies provided loan services since 2002 to several online payday lender portfolios following an industry standard called the Delaware Model, which provides for automatic but optional loan renewal. The industry and the Tuckers successfully grew. Tucker serviced more than one million loans in 2011 alone, which is the year before this action was filed, and employed more than 900 people and issued more than five million loans from 2008 to 2012. In the last year before the FTC filed this action, 2011, 43 percent of all the borrowers, all the loans were made to returning customers. The unauthorized automatic clearinghouse transaction rate was only 0.30 percent, and their internal complaint ratio was below 1 percent. Scott Tucker's expert and a former FTC Director of Economics, Dr. David Sheffman, found a 99 percent statistical correlation between the renewal conduct of repeat borrowers, who clearly understood the loan terms, and first-time borrowers, showing the statistical likelihood of customer confusion was minuscule from the sample of more than three million loans under TILA and Regulation Z. Although the FTC has investigated the payday loan industry for many years, including issuance of a civil investigative demand to Scott Tucker in 2002, the FTC has never used its rulemaking authority to give guidance of expectation different than the industry-wide disclosure practices Tucker and many others followed under the Delaware model. The $1.3 billion judgment has crushed the Tuckers financially. The court should reverse the District Court of Nevada's summary judgments for at least two main reasons, and some other reasons as well. But first, and most importantly, the District Court erred by misinterpreting the TILA Truth in Lending Act as requiring disclosure financing charges for subsequent optional loan renewals, which requires reversal of summary judgment for the FTC and requires summary judgment against the FTC as a matter of law in the FTC's TILA claims. Would you go over that again? I take it what you're saying is that there was an error in the question of law, not a question of fact, right? Yes, that's right. And what is that question of law again? The question of law is whether the Truth in Lending Act requires a separate TILA disclosure where there is a subsequent action to the original loan obligation. In this instance, it's a subsequent extension, which is an optional loan renewal. I'm looking at the loan note and disclosure, which has the four boxes on top. Yes, Your Honor. And as I understand it, the trial court held that the language was deceptive. And why wasn't it deceptive? If it has a tiny asterisk in the first line and then somewhere in the middle of the same paragraph, there's another asterisk, to decline the option of renewal, you must select your payment options using the account summary link sent to you to your email at least three business days before your loan is due. Isn't that deceptive? No, Your Honor. It's actually stated exactly correctly, and it's not deceptive. I don't believe it's deceptive at all. Well, it says the finance charge is $90, but if you don't do anything, you end up paying what, $600 and something? Yes, and most customers have preferred the automatic extension. But the Truth in Lending Act, the law, and Regulation Z require disclosure of the obligation, and that's what the TILA box does. It discloses the finance charge for the obligation. And the very next sentence, the FTC talks, I see what you're saying, Your Honor, and the FTC certainly makes a large point of your question. And the FTC suggests that this is fine print or scrambled up information, but in reality, the Truth in Lending Act and Regulation Z require the finance charge of the obligation to be most prominent, and it is most prominent. And the very next disclosure and contractual statement is that if the customer declines the extension, that then this will apply, and then because that raises the question, or could raise the question, of what do you do to decline the extension, then that's also provided. And this discussion of it being fine print is a red herring, because the reality is, the TILA box has to be larger. So by comparison to the TILA box, the rest of it has to be smaller, less prominently disclosed. So figuratively, someone can call anything fine print after that, including one thing that's important to know in this case is this practice, the Delaware model, has been followed throughout the industry, and there are citations in the record that show some 15 or 20 other companies following this practice. And it's because it does accurately disclose the obligation. And that is my first point, is that Truth in Lending Act requires accurate disclosure of the finance charge for the obligation. And that's all it requires. Well, it does have to be accurate contractually, and so I understand Justice Scanlon's question is definitely a valid question, and I suppose the FTC could even make the argument. I understand why they do, but... Your position, as I understand it, is if it accurately describes the obligation, regardless how difficult it is for a person to glean or dig out that whole obligation, as long as it's there, right, you comply with TILA. I don't know if I would go that far, Your Honor, but possibly. I mean, it depends on the situation. I would think there could be some situations where it would apply. Well, if you wouldn't go that far, what's wrong with the district court's judgment? It found it to be deceptive, likely to deceive. Yes, and the likely to deceive part is another part of what we're objecting about. But again, the point, so the first point, we probably are clear, you're clear about my first point, is that the disclosure of the obligation is required under TILA. And as to your question about... No, I think if there was some unusually small fine print, that would apply. There's no unusually small fine print in this contract, though. That's important to us. Is it your position that on motion of summary judgment, the court should have taken the evidence in the best light for the non-moving party? Absolutely, Your Honor. Is that your next point? Yes, thank you for helping me bring it to my context, yes. And actually what happened here is the district court took the Federal Trade Commission's arguments and applied favorable inferences for the Federal Trade Commission rather than for the non-movement. Absolutely, Your Honor. And the statute is clear from the Truth in Lending Act, and I think it's also clear from this court on the same point, the Bone v. Hibernia Bank case from 1974, and other circuits are unanimous on this, too, that I've seen, and that was the Begala case from the Sixth Circuit, the first time where the court held also that additional finance charges for subsequent deferral of initial payment obligation doesn't require an additional TILA disclosure. The second Begala case said the same thing in 2000, and Ray Gunn in the Middle District of Alabama also said extensions on pawnshop loans are subsequent agreements not requiring additional TILA disclosures. But as to your, and also as to the point about the likelihood of confusion, which you raised also, and this is our second argument. It's a pretty low barrier, isn't it? I mean, it's not beyond a reasonable doubt. It's not even the prominence of the probabilities. It's just likely to deceive. Isn't that a pretty easy factual barrier to overcome by the FTC? It could be in many situations, but we don't believe this is the right situation for it. And one of the main reasons is because, in this case, the problem was that the district court ignored the expert and direct evidence of no likelihood of customer confusion from the net impression of the loan documents. One of the things your Honor may recall from the record or may see is that the magistrate judge made his own independent reading of the agreement and ignored the other evidence of the likelihood of confusion, of which there was much. And under that Stefansik case, there are a number of factors that can be considered, and the Tuckers presented strong evidence under each of the factors. And as your Honor said, the court drew favorable inferences for the FTC, including... That's true. I apologize. I said that. You're right. Yes, thank you. I think it's not clear to me. The original loan term was what? The original loan term? Well, the thing is there's, okay, there's 3 or 5 million of these, so they can be 2 or 4 weeks, something like that, maybe 2 weeks, I believe. But would a consumer looking at this, I mean, when I first read it, I thought, well, what this meant is that if I extended, I'd pay another $90. You know, not that I would suddenly find myself in a death spiral. It was going to lead me to a $975 payment. Okay. Well, that is actually your first instinct was correct, because it is another $90 for an extension. And actually, this version of the Delaware model is not, and I appreciate what you're saying for the death spiral, but there were actually many companies that had no payoff plan for the principal, because some of them would just continue to extend automatically. And this one did. The Tuckers plans do have the payments towards the principal, which is disclosed. Where does it tell me if I extend once, I can get out of this? Well, it's actually, it's the same thing, that you decline, if you decline the automatic extension, you're out of it right from the first, and every time there's an extension, it's the same thing. You can decline to extend it. And what happens, oh, physically, is an email comes and gives you a link that says you can go to court, and so I was getting an email every time the term expired. Yes, that's right. And of course, it's all done on the Internet, so that's the whole process for it. And so one of the things that I was going to say also about the favorable inferences for the FTC, there was unreliable hearsay that the magistrate judge relied on, as opposed to the very persuasive, unrebutted analysis of Dr. Sheffman showing 99% correlation in payment renewal behavior between first-time and experienced borrowers, demonstrating an absence of confusion or deception at any level. All the consumer witnesses the FTC provided ultimately recanted their initial positions and admitted they were not warnings, and instead of viewing the loan document set as a whole, as I mentioned, the magistrate judge just viewed one portion of one document and said, I think that's all I need. I don't really need to know what the net impression of the likelihood of confusion is, and that's not the right standard. And it's also either legally or as to the basic application of the summary judgment standard of considering the facts and drawing the inferences in favor of the non-movement. So the other stuff and check factors that were present were the business longevity, the low customer complaint and chargeback ratios below 1%, and the high repeat customer ratio, which all indicated low likelihood of customer confusion. But the unreliable hearsay that I mentioned is the consumer witnesses, which were each discredited, and the magistrate himself said that the consumer complaints were sometimes triple hearsay and not identified by name. He recognized that the consumer complaints should be viewed with caution because they had been created in anticipation of litigation, had been truncated, modified, and subsequently corrected, showing them not to be trustworthy. But I thought the magistrate relied on his own impression of the text to be misleading without weighing the individual evidence of the declarations. He did, and he ignored all the evidence about the likelihood of confusion. As Your Honor mentioned, that's the standard that you should follow. Isn't the right test whether the objective consumer would be misled? Yes. But the evidence that's relevant isn't the Stefanschik opinion. The Stefanschik opinion, and for example, of those complaints that came, I'm sorry, I didn't mean to interrupt there, of those complaints, only 750 of them were of this type of confusion. That's out of 3 million transactions, which is an amazingly low percentage. It's one-tenth of 1% is the only example that they have. And again, what happened is the magistrate described the FTC's conduct of bait and switch by failing to disclose its change of material witnesses, and in this list of unreliable hearsay complaints, which the FTC chose to rely on after discovery had cut off, rather than disclosing the names of any of these consumers, because all the consumers who had been deposed showed that they were not confused by any of the language. And I see that my time, maybe I should reserve for rebuttal. One last question. You're also relying on Kocash, the same arguments that we just heard. That's true, Your Honor. It's a yes. And the briefing yes addresses those, and I could also rebuttal possibly. Good morning, Your Honor. Please, the Court. This is Imad Abyad for the Federal Trade Commission, and with me is Nick Sanghvi, who is the lead trial lawyer. Mr. Tucker's counsel went through a whole litany of issues, so I'm going to try and be brief on each one. I'm principally concerned with one issue, Mr. Abyad, which is this. Both the magistrate and the district court judge, and all of us, have been able to read this TILA announcement, loan disclosure, and understood, and now we understand, that if you don't send a notification in three days before the end of the period, the loan will be automatically renewed with a new finance charge. Now, if all of us understand that, isn't it rather condescending for the court to find, as a matter of law, that the consumer doesn't understand it? Isn't what we're saying rather a classist argument, saying, even though we understand, the poor consumer doesn't, and we find that as a matter of law and disregard all evidence contrary? Thank you, Your Honor. No, in fact, not at all. Why not? First, if I may respond directly to your point, all of us here, our attention was, in fact, focused on the exact terms of the notes in the context of a problem. And so, in fact, as counsel had mentioned, even when the... What we're focused on is the text. The text of the disclosures, absolutely. But that was brought to your attention by the fact that there was a problem. There was no problem with the consumers. In fact, the four consumers that were deposed... The problem with the consumer is to read the contract before he signs it. The problem... So your argument is that if the consumer accurately reads the TILA box, anything else in the contract that modifies the TILA box terms is irrelevant as a matter of law? Correct. What case says that? That's in Rubio, Your Honor. That's exactly right. In Rubio, the terms in that... Well, there it was called the Schumer box because it was a credit card, but it's the exact same concept. In Rubio, the Schumer box said that the rate for the credit card could be raised under one of three conditions. One, two, three. Somewhere else in the contract said the interest rate for the credit card can be raised without any conditions. And this court said, no, you cannot use other terms in the contract. There are certainly ones that are not as clear as these to modify what was in the TILA box. The whole reason why we need the TILA box is that so it is clear to people what is it the terms of credit is or are. So if you look at this TILA box... Can I just ask from a reasonable consumer's point of view, the first thing that I see when I look down to the box, and it's a big threat, is 684%. Isn't that a red flag that should lead me to look pretty carefully at what this is saying? No, not at all, because this reflects the interest rate because you're paying $90 for two weeks worth of... I understand how the calculation works, but isn't that a warning that if I start extending this, I'm looking... If you start extending this, that's the whole problem. We have no problem with renewals per se. It's that the consumers need to know that these are automatic renewals. The TILA box reflects one term, you get $300 loan, you pay $90 in two weeks. What the consumers actually did, and none of this is disputed, that's why it's perfect for summary judgment. What they actually did is what's reflected on the very next page of the district court's decision, which is they automatically renewed, and instead of the consumer paying $90, ends up paying $675 on a $300 loan. Unless within three days before the end of the period, the consumer sends a communication saying, I don't wish to renew, and then his bank account will be credited, pardon me, debited, the amount of the loan. And of those consumers, Your Honor, of the millions of consumers that in fact took loans out of the defendant, only 6 to 8% have actually managed to cancel in the first period. That can be because 92 to 94% wanted to renew. There is no evidence whatsoever that that's the case. The evidence is the terms of the contract. What you're saying is, as I understand, if it's in TILA saying one thing, and it's modified in the fine print, the consumer is not charged with the fine print. As simple as that. If I may remind the Court here, we have two different violations here. There is a violation of Section 5 of the FTC Act, a direct violation, and then there is a violation of TILA, which itself becomes a violation of the FTC Act. As far as TILA is concerned, Rubio forecloses this case. Rubio said you cannot ---- I'm looking for the citation to Rubio. I looked in the red brief and I can't find it. Can you help me? What's the citation to it? Absolutely, Your Honor. Was it cited in your brief? Yes. Okay. It's 613F3-1195. Where is it cited in your brief? I'm looking at your case. It's on pages 47 and 53 of our brief. All right. And what's the name of the case? Rubio, R-U-B-I-O, versus Capital One Bank. All right. I'm sorry, but for whatever reason, I'm looking through the alphabetic list, page V. It's on page 6. It's on page VI, the very first one. I don't see it. Give me the site again. 613F3-1195. Thank you. It's a 2010 case. Thank you. So as far as TILA is concerned, Rubio forecloses their argument. What's in the TILA box is the terms of the extension of credit. Here, they said they will charge $90. Instead, they charge $675. And they cannot justify the $675 by things that are not in the TILA box. But that is not the only violation. There is a section V violation, which the district court, both judges, the magistrate judge and the district judge, on review, found that the net impression of the note disclosures is deceptive. And as far as the net impression is deceptive. Correct. As a matter of law. Correct. No reasonable jury could find that a borrower could glean the true terms of this transaction. Is that correct? That's what both judges said. All they need to do is you look at this document. But can a judge do that? Or should that be done by a jury? If it needed to be done by What do you do with the expert testimony of the defendant in this case saying that there was no such deception? That is not at all what the expert said, Your Honor. First of all, the entire expert opinion is built on a false premise. The premise being, and if I may explain first. Did you object under Dobert principles and did the district court sustain your objection and strike the testimony of the expert witness? But the district judge. Then what you're saying is you think that on cross-examination of the expert you could destroy his conclusion. We did not need even to do that, Your Honor. Well, if you didn't do that, then there is evidence. No, I'm not saying we did not need to do that. You go ahead and talk and then I'll finish. I'm sorry, I apologize. So what we have here, if I understand it correctly from Mr. Ray, is some evidence that he claims allows a reasonable jury to find there was no deceptiveness in the known document. The court didn't consider that as raising a tribal issue of fact. Why not? Why wasn't the court wrong on that? Because the court said that the entire expert opinion is built on a false premise. That's why it could not accept it. One of the, in fact, not one, the primary assumption. So the court struck that evidence from the determination? Well, it said it was not, that it could not defeat the net impression that was in the. The court did that without objection from the FTC? Did it on sui sponte? No, we argued the point, Your Honor, that the expert opinion is built on a false premise. It also had different, you know, other problems with methodology. But more importantly, the main primary premise for the expert opinion was a false premise. And so we pointed that out to the district court, and the district court rejected it properly. And the false premise was? The false premise is that those that are called repeat customers must have known the terms of the loan. The problem with that is twofold. One, it is the repeat customers assumes that customers knew they were going back to the same company. There is no evidence that that's the case. Defendants used seven different trade names to extend their credits. And so you go and get a $300 loan the first time from a Merrill loan. That repeat customers must have known the rates and terms doesn't sound to me like a false premise. It sounds to me like an arguable premise. Some people might say this is circumstantial evidence that they knew what they were getting into. Some people might say it's not at all. But it doesn't sound to me like a premise which can be found on motion of summary judgment by the district court to be unreasonable as a matter of law. I beg to differ, Your Honor. Speak to me. Okay. If we can get to the idea of what repeat customers are. Their expert assumed there are repeat customers and that those repeat customers must have known the terms of the loan. That's why they came back. Right? But the definition of repeat customer itself does not reflect the facts. The consumers did not know they were being repeat customers. They did not know they were going back to the same company because they used seven different trade names. In other words, if I borrowed $300 from AmeriLoan, one of their trade names, and then I went back and borrowed $300 from 500 Cash, Fast Cash, another one of their companies, their expert considered those to be repeat customers. But the customer didn't know that they were going back to the same company. That's one. Number two. Did you offer expert testimony of your own? Not on liability, Your Honor. Not for liability purposes. So this is really argument. It's not counter-balancing expert. It's argument. Exactly. Exactly. The second problem with that assumption is the record reflects that more than 94, I think more than 95% of the defendant's customers, in fact, did not come to them through their own websites. They came to them from third-party generators, lead generators. So that's yet another level. So when I go, if I Google, I want a payday loan, and I'll get Company X. Company X takes my information, passes it on to one of the seven different portfolios for defendants, and I get from the defendants, congratulations, you've been approved for $300 loan. The end consumer had no idea they were going to the defendants, even the first time, much less the second time when they used a different trade lien. But the terms were the same. Regardless of what company they went to, the terms were the same, right? In the Tillabox. Yes. Correct. The problem is not those terms. So regardless of whether they knew they were going back to the same company, they knew they were going back to the same terms. No, Your Honor, because they did not know that. So a consumer that paid $300, right? And let's say the consumer knows that, in fact, they've been duped, and that they paid $675 instead of $300, right? Now they go back to what they thought was a different company. And that company says, yes, I'll charge you $90 for the $300 loan. But how is the consumer to know that that company also, because it happened to be another one of their defendants' portfolios, will also dupe them out of $675? By reading the declaration. What declaration? I'm sorry? By reading the disclosure. Oh, they are – Your Honor, that's not what the law says. The whole reason why Tilla says put the important terms in big box that is conspicuous and clear. So you're saying if it's in the Tilla box, the consumer can disregard the fine print. That's what Rubio says. That's what Rubio says. And that's the case you have. I'll take a look at that. Yes. What Rubio said is you cannot change the terms in the Tilla box. There, the Schumer box, it's the same thing. You cannot change the terms in the Tilla box with other terms in the contract that are outside. Because that defeats the purpose of saying by law you need to put the important terms in the box so the consumers can see it. It's not a – What should have been in the box, then, in terms of your interpretation? I'm sorry, Your Honor? What should have been in the box? Instead of 90, it should have been 675. Instead of $390, it should have been $975. Because these terms that they put in, these are not the terms of the agreement. In fact, the only way a consumer could pay only $390 is if he executed a separate agreement. When the 6 to 8 percent of the consumers that managed to cancel, when they – The consumer doesn't have to execute a new agreement. He has to give notification three days before the end of the term. They required him to sign, Your Honor, new authorization for their automatic withdrawal from the bank. They required new signatures. But that's not a new agreement. That's a notification. No, it's an agreement. It's not a new note, but it is a new agreement where the customer, the consumer, agrees to which withdrawals can they take out of his bank account or her bank account. That is an agreement. I think we're getting off track here. Thank you. I'm sorry. I'm not telling you to stop. I'm saying you give the three-day notice and tender the $390. Isn't that the end of the contractual relationship? I'm sorry. Say that again. If you – If I give the notice within the three days and then tender the $390, isn't our contractual relationship ended? That's not how it worked, Your Honor, because you don't tender the cash. They made – Or did I permit it to be withdrawn? Right, which itself was a violation they settled. But it's over at that point. I'm no longer contractually bound. Whatever the – Correct. Exactly. If you, in fact, managed to find the way to stop the renewal, and you signed the agreement that then now they can only withdraw $390 as opposed to $975, then, yes, that's the end of your obligation. But that's not what was in the agreement. That's not what? That's not what was in the telebox. That's not what was in the original note disclosures. But it's in the note disclosures. Not in the telebox, Your Honor. It's not in the telebox. Not in the telebox. Your whole case rests on whether Rubio says what you say it does, because otherwise what we would be doing would be saying when a person contracts to take a loan, only certain terms and not all the terms apply to him. That's as far as the televiolation is concerned. Let me be very careful here. There are a second violation that the entire judgment also is justified by, which is the direct Section 5 violation, which is the net impression of not just the telebox, but the telebox and the fine print. Both judges found the net impression of that to be deceptive. And my question is, should the judges have found what the net impression was as a matter of law on a motion for summary judgment when there was at least proffered some contrary evidence by the nonmoving party? But, Your Honor, the standard for summary judgment is not that so long as you offer any evidence, you defeat summary judgment. That's true. It has to be whether any reasonable person on a jury could find for the nonmoving party. And both judges found that there was no reasonable chance that that would happen. And the question is, should we agree with those judges? Yes. Kokesh, you rely on the same arguments as your colleague. If I may add just one more thing about the difference between the way the FTC does things and the way the SEC does things. The FTC, just in its last year report to Congress, identified, for example, of all of the cases that it brings under 13B, it distributed to consumers almost $400 million, $390-some million back to consumers in consumer redress. Compared to that, it sent $650,000 back to Treasury. So the idea that, because that was one of the main arguments in Kokesh for why the SEC's discouragement was penalty, because often it goes to Treasury, where here in the FTC's case, less than 1%, it's about 0.2% of what the FTC collects goes back to Treasury. And it only goes to Treasury if there was no way to identify the consumers or there was no way to administer the redress. I doubt seriously you're going to get 100% performance on returning to every single consumer. But that's as close as it gets. What happens to those that you can't reach? What happens to those funds? Well, typically, in the order that the court enters, in this order, for example, the court said, the money, if you cannot return the money to the consumers themselves, you could be able to use some of the money for consumer-related education as long as it's related to the same practice. In other words, educate consumers about that practice. And if there is anything left over, then you have to send it to Treasury. But that's it. Thank you, Your Honor. Mr. Wray, you have some time for rebuttal. Thank you, Your Honor. And I would just point out for hopefully the Court's convenience that the Rubio discussion by the appellants was on pages 44 and 45. Of the red brief? Of the opening brief. No, not the opening brief. Your brief? Right, my opening brief. Or my co-counsel. So you're saying it wasn't cited in the red brief? It was only cited in the blue brief? No, I think it was cited in both briefs. And to summarize, and I think Your Honor's hit the key issues, that there was expert testimony that created a genuine issue of material fact for the effect and whether the net impression of the contract terms was likely to deceive consumers. There was no Dawbert objection. There's also no expert testimony whatsoever from the FTC. The comment about 6% to 8% is clearly an analysis of the facts. And so if that one argument even applied, it would show grounds for reversal. Further, what should have been in the box, that was one of the last comments that was the FTC addressed. And that was something that we tried to get the FTC to commit to below. This is the first time in the case they've done that where they've said what should be in the box. Very noncommittal up until now. And we got a specific number of 675 or 975 that counsel gave. But if those numbers would have been put in the box, it would have been, that would have been deceptive and likely to confuse, and it would have been inaccurate because it would not have accurately stated the finance charge for the obligation, which is my first point. And under the Truth in Lending Act, that's what has to be in that box, is the disclosure of the finance charge for the obligation. And that's where the error was in the Truth in Lending Act ruling of summary judgment. And because this is actually the focus of the FTC, that's why we also argued that under the rulemaking authority, the FTC is essentially trying to change the rule of Regulation Z and the Truth in Lending Act. And this court held in the ‑‑ How are they trying to change it? They're trying to change it to say that, well, as we just heard, that there would be a disclosure of the finance charge, which is not actually what the obligation is. That would be a big change. And so also the other question that Your Honor had asked earlier briefly about COCESH, because the Truth in Lending Act is the focus of the change or basically the rule that the FTC is looking for, which I'm saying is a change is what they're looking for. The focus of that is this rule under the Truth in Lending Act that actually would implicate COCESH as to the statute of limitations, which should be one year under the Truth in Lending Act. The whole premise of the FTC is that a violation of the Truth in Lending Act is a violation of the FTC Act, but it's not. Well, it would be if it were a violation, but in this situation, because the obligation is accurately disclosed, the finance charge for the obligation is correctly disclosed. It's not a violation of the Truth in Lending Act, which is why we request the Court to vacate both summary judgments and to grant summary judgment as to Scott Tucker and also as to the rulemaking authority and also as to the other grounds stated in the briefs. Thank you, Your Honor. Thank you, gentlemen. Thank you for illuminating argument. And we'll take a break for the next ten minutes. And let me just apologize to counsel. I have now found the Rubio case. Thank you very much.
judges: O'scannlain, Bea, Stearns